JACOB CLAYPOOL *et al.*, Appellants, *v.* ARCHIBALD McALLIS-
TER *et al.*, Appellees.

APPEAL FROM WILL.

Where a party who had been keeping a ferry near to another ferry, leased his boat to be used by the person keeping the other ferry, he will not be held liable for an accident occurring on the boat while in the use of another.

Nor will the party who owned the boat be liable for not maintaining a ferry, in an action on the case for an injury to animals, while the boat was in the use of another ferry keeper.

A ferryman has the absolute right to direct what position each person shall take on the boat, without reference to priority of arrival at the ferry. If a party shall not be ferried in proper time, he must seek his remedy by action.

THIS was an action on the case brought by appellees against appellant.

The plaintiffs allege, that on the first day, of November, 1854, they delivered to the defendants, being then and there the owners, duly licensed, of a certain ferry across the Illinois river, at Morris, and common carriers, and defendants, as such owners and occupants of said ferry, and common carriers, received from the plaintiffs upon the ferry boat of defendants, a span of horses, harness, and wagon loaded with stoves, to be by defendants ferried across the Illinois river at Morris, for reward; and the defendants so being such ferrymen and common carriers, and their servants and agents, so carelessly behaved and conducted themselves in the premises, that by and through the carelessness, negligence and default of defendants and their servants and agents in the premises, the said horses, harness, wagon, etc., were wholly lost.

That on the 14th day of Nov., 1850, the defendants obtained a license to keep a ferry across the Illinois river, at a point between the S. frac. of the N. E. ¼ of Sec. No. 9, R. 7, and the E. ½ of block 17 of the canal addition to Morris, for five years from the 27th day of Feb., 1851, provided the defendants should enter into a bond to keep said ferry in all respects in accordance with the statute, and should pay a certain tax named in said order; that defendants complied with the requisitions aforesaid, and accepted the powers and franchises so granted, and afterwards, to wit, on the first day of April, 1851, at the place mentioned in said license, did establish the ferry across the Illinois river.

And plaintiffs aver, that by reason of the acceptance by the defendants of said powers and franchises, it became and was the duty of defendants to be furnished and provided at that place with good tight boat or boats, of sufficient number, dimen-

sions, etc., for the transportation of all passengers, teams, etc., and with men of sufficient number, skill and strength to manage the same.

And plaintiffs aver that on the first day of Nov., 1854, at the place of the ferry aforesaid, upon the ferry boat so as aforesaid furnished by said defendants, they delivered one span of horses, wagon, etc., to be ferried across the river for certain toll in that behalf.

That on the day aforesaid, and previously, the defendants neglected and omitted to provide themselves with a good tight boat or boats, but the boats furnished were old and leaky, without sufficient rigging or implements, and did neglect and omit to furnish suitable small craft, and did neglect and omit to furnish said boats with men of sufficient number, strength and skill to manage the same, and by reason of such insufficiency of said boat, rigging and implements, and the carelessness and indiscretion of the men upon the same, and the insufficiency of the number of the men, and the omission to furnish any small craft, etc., the horses, wagon, and other property of the plaintiffs, were thrown into the river, and the horses were drowned and the other property damaged.

Plea, general issue.

There was a change of venue to Will county on petition of plaintiffs.

There was proof that defendants established a ferry at Morris in the spring of 1851, under a license for five years.

*Evan Roberts* testified, that he drove the team that was drowned; the property belonged to plaintiffs; that they went on to a ferry boat at Morris, in Grundy county; that they went overboard from the ferry boat into the river, and the horses were drowned and the property damaged; that the cause of the accident was a want of sufficient bars or chains across the ends of the ferry boat, and there was no sufficient small craft to assist in saving the horses after they went over. The ferry was at Morris; there were two ferry boats connected together; the boat farthest from shore, and from which the team went off, was called the Claypool boat, and that the man who directed him what place to take upon the boat was called Slyter.

*John McCrary* showed, that the team of the plaintiffs was drowned and their property injured, at a ferry in Morris, and showed the amount of the loss, and that the boats were deficient in not having chains or bars at the end, and that the ferriage was paid. There was no other ferry at that time near that; I know the boat the team went off from was the Claypool boat; Slyter had the boat at that time, and was working it; Slyter was running the ferry at that time; know that he had charge of

the ferry sometime before the accident; did not see either of the Claypools about the ferry that summer, except when crossing as passengers.

*C. M. Gould* testified. I reside at Morris; have resided there twelve years; William E. Armstrong originally run a ferry at Morris; Mr. Claypool run a ferry at Morris after Armstrong did; a free ferry company also run a boat there; Mr. Clapp was the ferryman for the free company; a part of the time he run the boat for whatever he could get; a Mr. Slyter run the same ferry after him in 1854; Slyter was running the ferry; Clapp used the boat that Claypool had run when he, Clapp, was running under the free ferry company; Slyter used it after he had got the ferry of Clapp. Claypools commenced running their ferry in the year 1850 or 1851; Claypools had two boats then; they charged and received ferriage; two boats were attached together in the summer, or early in the fall of 1854; one of the boats belonged to the Claypools, the other to the free ferry company; I knew the Claypool boat from the time it was first put on; I never knew any chains or bars across the end of it; the ferriage was done by the Claypool ferry for any one except for the members of the free ferry company; Clapp and Anderson made an agreement with the free ferry company for their boat, and then hired the Claypool boat; Clapp and Anderson then let Slyter have both boats, who afterwards run the ferry.

*Alonzo Keith* testified. I was at the ferry in Morris at the time plaintiffs' horses were drowned; Slyter had charge of and was running the ferry; the driver disobeyed Slyter's instructions.

*Curtis Cobler* testified, that he was present at the time of the accident, and that the boats were in good repair; Mr. Slyter had charge of that ferry at the time of the accident.

*Isaac N. Fitch.* The testimony of this witness tended to show that he was present when the team was drowned; that the driver of the team disobeyed the orders of the ferryman; that the team was drowned from his neglect. A man by the name of Slyter had charge of the ferry at that time.

*Andrew Ober.* Deposition read by defendants.

The testimony of this witness tended to show that the accident was occasioned by the fault of the driver of the team, in disobeying the instructions of the ferryman; that Mr. Slyter was running the ferry, and gave directions as to the teamster about placing his team on the boat.

*Jos. James* testified, that he was present at the time the team was drowned; that the accident happened solely from the fault of the driver of the team. Mr. Slyter was on the ferry at that

time; think he had charge of it; seemed to have most to say about it; Mr. Slyter gave directions to the drivers of the teams in relation to their order of coming on the boat.

*Allan W. Slyter* testified as follows: One of the boats was owned by the Claypools, and the other by the Morris Free Ferry Company; I controlled the boats at the time, and received the money for the ferriage, or my hands did for me, for my own use; the ferry had been erected by William Clapp, and put by him into the hands of Smith, Clapp & Anderson, and I gave them a stipulated price for what I could make out of it, to the expiration of their time; the agreement between myself, Smith, Clapp & Anderson, was, that I was to pay them a stipulated price for the use of the ferry during the balance of their term, and they were to deliver the ferry to me clear and free from all incumbrance, and in good running order; the accident happened while I was running the ferry.

The jury found a verdict for the plaintiffs for $479.

The defendants moved for a new trial. The court overruled the motion, and the defendants appealed.

GLOVER & COOK, for Appellants.

W. K. McALLISTER, for Appellees.

CATON, C. J. This action was brought against the defendants, as ferrymen, for the loss of property from their ferry boat. The evidence shows that the defendants had a license to run a ferry at Morris, and under that license they established a ferry, and for a time run the boat from which the team was lost. That they subsequently leased this boat to other parties who were running a rival ferry near by, and that while the boat was in the possession of, and being run as a ferry by those other parties, the team was received on the boat by the parties who had thus rented the boat, and while it was being ferried over the river was lost. It may be inferred that the defendants had ceased to run a ferry under their license. Under this state of facts the court instructed the jury that the defendants were liable for the loss to the plaintiffs.

In this case it is unnecessary to say whether the ferry license of the defendants could be assigned or not. Slyter did not profess to run the ferry under the defendants' license. The only connection the defendants had with this ferry was that they had leased one of the boats, which was used for that ferry. This created no greater obligation against them for losses which might occur from its bad management or the carelessness of the ferryman, than as if they had sold the boat absolutely. They

sold its use for one year, and were to receive a compensation at the rate of ten dollars per month for such use. As well might the owner of the rope used, who had leased it to Slyter, be held responsible for its improper or negligent use. Indeed, there would be as much propriety in holding the man who built the boat to the same responsibility.

Nor could the defendants be held responsible for this loss because they neglected to keep up their ferry, as they were bound to do under their license. Whatever liability they incurred for such neglect was in another form of action. As well might the railroad company which neglects, or refuses to furnish passage for a man, be held responsible for his death, when, being thus compelled to start on foot, he falls down and breaks his neck. No such liability attaches to such violation of legal duty.

There is one other instruction which we deem it proper to notice. It is this: "That all persons had a right to be received upon the ferry boat and conveyed across the river in question, according to their arrival, or first coming to the ferry, and if the team in question arrived first at the said ferry, the driver thereof had the legal right to go upon the said boat on its first passage over the river." The evidence showed that the ferryman directed the plaintiffs' driver to take a different position on the boat, and allow another team to go on first, and that the driver refused to obey his orders. A witness also swore that if the plaintiffs' team had taken the position assigned it by the ferryman, the accident, most probably, would not have happened. As was held by this court, in the case of *Fisher* v. *Clisbee*, 12 Ill. R. 344, the ferryman must be the captain of the ferry boat, and must have the absolute right to assign to each one his position on the boat. He best knows the capacity of his boat, and is supposed to be most skilled in its management. At any rate, there must be a head,—a controlling power to a ferry, as well as anything else that is safely and successfully conducted. If the ferryman abuses his powers, and refuses to to take a passenger or a load on the first trip, when he could safely do so, he would be liable to an action for damages; but still, the safety of all requires that he must be permitted to determine when and how he can safely take a passenger, a team, or a load. But of all others, the claim here set up by the driver, was the most groundless. What difference, in point of right, whether he was put in the middle of the boat instead of the end? The instruction was improperly given.

The judgment must be reversed and the cause remanded.

*Judgment reversed.*